C. Benjamin FOY, Plaintiff–Appellee,

v.

FIRST NATIONAL BANK OF ELKHART, Defendant–Appellant.

No. 88–2264.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1989.

Decided Feb. 8, 1989.

Stanley C. Fickle, Barnes & Thornburg, Indianapolis, Ind., for defendant-appellant.

Richard D. Bonewitz, Hammerschmidt, Bonewitz, Amaral & Jonas, South Bend, Ind., for plaintiff-appellee.

Before POSNER, COFFEY, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

This appeal presents issues under Article 9 of the Uniform Commercial Code. We simplify the facts ruthlessly. Castleman was a van converter in Elkhart, Indiana. He would buy the chassis for the van from Ford Motor Company or some other vehicle manufacturer, complete the van, and sell it to an automobile dealer for resale to the consumer. Castleman's business was financed by the First National Bank of Elkhart under a floor-planning arrangement. Floor-planning is a method of financing

dealers' purchases. The lender obtains a lien in the purchased good and the lien is released when the dealer resells the good. In this case, the First National Bank of Elkhart advanced the money that Castleman needed to buy the chassis for the van and Castleman was supposed to reimburse the bank when he sold the completed van to a dealer. The bank's loan was collateralized by the chassis and (when completed) the van. The bank duly filed its security interest, and the parties agree that the bank had a perfected such interest. The bank took two additional steps to protect its interest. First, it conducted quarterly audits (preannounced rather than surprise audits, however) of Castleman's business. This involved visiting his premises and counting each chassis and van to make sure there were as many vehicles as there were advances outstanding. Second, the bank insisted that Castleman give it the certificate of origin that the manufacturer of the chassis had given Castleman when Castleman had bought the chassis, to hold until the bank was repaid. When Castleman had a buyer for the van, he was to inform the bank and the bank would give him the certificate of origin so that he could pass it on to the buyer. The buyer (an automotive dealer) would in turn pass the certificate on to *his* buyer, the ultimate consumer, who would need it to obtain a certificate of title to the van. Castleman was to either pay off the advance before the bank gave him the certificate of origin or issue a trust receipt to the bank in exchange for the certificate and pay off the advance as soon as the dealer paid him.

Enter Foy, a large automotive dealer in Pennsylvania. Castleman offered to sell Foy vans that he would repurchase if Foy could not resell them. Castleman told Foy that he (Castleman) would hold on to the certificate of origin, since he might end up repurchasing the van, until Foy had a customer. He did not tell Foy that the bank was holding the certificates of origin. On the contrary, he told Foy that he, Castleman, had them—in his desk drawer. Foy testified that he had no reason to doubt Castleman, even though it appears to be a common practice, in Pennsylvania as else-

where, for banks that finance automotive dealers (which Castleman in a broad sense was) on a floor-planning basis to hold on to the certificate of origin until the vehicle is resold, in order more fully to protect their security interest in the dealer's inventory. See *Fiat Motors of North America, Inc. v. Mellon Bank*, 827 F.2d 924 (3d Cir.1987); Practising Law Institute, Recent Developments in Commercial Finance 201, 206 (1979). The Pennsylvania bank that floor-planned Foy's purchases of vehicles did not require him to hand over the certificates of origin. If it had required this, Foy would have had to insist that Castleman give him the certificate as soon as Castleman sold him a van, for otherwise Foy could not finance the transaction.

Foy bought a number of vans from Castleman, paying cash but receiving the certificate of origin only when Foy was ready to resell the van; often this was months later. Occasionally Castleman would borrow back one of the vans he had sold Foy, on the pretext that he wanted to show it to another dealer. In fact Castleman—who in his sales to Foy and other dealers was pocketing the proceeds of the sales rather than repaying the bank's advances—was borrowing back vans from Foy in order to fool the auditors of the First National Bank of Elkhart. Since the bank's audits were preannounced, Castleman knew when to expect them, and he would use the borrowed vans to swell his apparent inventory of unsold vans. Even with this subterfuge, his inventory was always short of what it should have been, but he explained to the auditors that the missing vans had been entrusted to other dealers for possible sale. The auditors accepted this explanation without trying (as they easily could have done) to verify it by calling the dealers to whom the vans had supposedly been entrusted. The bank's audit records contained the notation "verified by phone" beside every missing chassis or van, but there was evidence that these statements were incorrect (Foy, for example, testified that he had never been called)—so the district judge found, at any rate, and the bank does

not contend that the finding is clearly erroneous.

Since Castleman's purchasers would demand the certificates of origin eventually, his house of car(d)s was bound to collapse; and when it did, and he defaulted, the bank was holding ten certificates of origin of vans that Castleman had sold to Foy. It refused to hand them over to Foy unless he paid off the bank's loans on the ten vans. He refused, and brought this suit (a diversity suit governed, the parties agree, by Indiana law) against the bank, claiming that he owns the vans free and clear of the bank's security interest and demanding the certificates plus damages. After a bench trial, the district judge awarded Foy some $64,000 in damages (mainly for depreciation of the vans, which are unsalable without the certificates of origin) and ordered the bank to give Foy the certificates. 693 F.Supp. 747 (N.D.Ind.1988).

Section 9–307(1) of the Uniform Commercial Code, enacted in Indiana as Ind.Code § 26–1–9–307(1), provides that "a buyer in ordinary course of business takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." Section 1–201(9), a definitional section applicable to all articles of the UCC, defines "buyer in ordinary course of business" as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind...." And section 1–201(19) defines "good faith" as "honesty in fact in the conduct or transaction concerned." Although the evidence was in sharp conflict, the bank does not challenge Judge Miller's finding that Foy had no inkling that Castleman was violating his floor-planning arrangement with the bank. The finding is at least plausible, since, as we noted, the bank that floor-planned Foy's purchase of vans and other vehicles did not require him to turn over the certificates of origin to it.

■ But was Foy a buyer in ordinary course of business when he bought vans from Castleman without insisting that the certificates of origin accompany delivery? The bank argues that this is an ultimate finding of fact and is therefore not entitled to the deference that Fed.R.Civ.P. 52(a) requires that we give findings of fact (we can reverse them only if they are clearly erroneous). We agree up to "therefore." A number of our recent cases hold that, for purposes of appellate review, an ultimate finding of fact, which is to say the application of a legal standard to the lay person's idea of "the facts of the case"—and thus the application of the legal standard "buyer in ordinary course" to the dealings between Castleman and Foy—is a finding of fact subject to the clearly-erroneous rule. See, e.g., *Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir.1988); *Hartford Accident & Indemnity Co. v. Sullivan*, 846 F.2d 377, 384 (7th Cir.1988); *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986). (The Supreme Court has held that factual inferences, such as intent, are facts for Rule 52(a) purposes, see *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), but an inference is not the same thing as the application of a legal standard, so *Swint* does not control the present issue.) Since such a finding is particularistic, there is no need for the degree of uniformity that is achieved by treating a question as one of law. We need not rest on general principles, however. The cases hold that the question whether a buyer is in the ordinary course of business is indeed one of fact for purposes of appellate review. See cases cited in 1 Anderson on the Uniform Commercial Code § 1–201:23, at pp. 189–90 (3d ed. 1981), and Nov. 1988 Cum.Supp.

■ Did Judge Miller commit clear error in finding that the dealings between Castleman and Foy were in the ordinary course? We agree with the bank that the term "ordinary course" refers to the practices of the trade rather than to some idiosyncratic mode of dealing between the buyer seeking to avoid a perfected security interest and his seller. See, e.g., *Bank of Illinois v. Dye*, 163 Ill.App.3d 1018, 115 Ill.Dec. 73, 517 N.E.2d 38 (1987); *Finance America*

*Commercial Corp. v. Econo Coach, Inc.,* 118 Ill.App.3d 385, 390, 73 Ill.Dec. 878, 882, 454 N.E.2d 1127, 1131 (1983). The second interpretation would be a formula for evasion. However, the evidence as to whether the dealings between Castleman and Foy were out of the ordinary for the converted-van trade was in conflict. Although there was no evidence that any van converter has ever agreed to repurchase his vans, this may not be important: not only because a seller's agreement to repurchase is too commonplace a feature of selling to be thought extraordinary, but also because the only aspect of the dealings between Castleman and Foy that hurt the bank was Castleman's not delivering the certificate of origin together with (or immediately after delivering) the van. The two features of the transactions are connected: the delivery of the certificates was delayed *because* Castleman might repurchase the vans.

The world's largest Ford dealer (!) testified that he *always* gets the certificate of origin when, or immediately after (within a day or two), he receives the vehicle. Foy and another dealer, a close friend of Foy's, testified that "they normally would not receive the certificate of origin until one to five weeks after the sale." 693 F.Supp. at 751 (footnote omitted). But the judge disbelieved this testimony, concluding cryptically that "some, but not all, van converters provide the certificate of origin contemporaneously with delivery of, and payment for, the van." *Id.*

■ The bank's principal argument was and is that the repurchase arrangement, which made inevitable or at least expedient long delays in Castleman's delivering the certificates of origin to Foy, was not in the ordinary course of business because no other van converters employ this method of dealing. We have already expressed our skepticism about this argument. The judge rejected the argument on the ground that the UCC's requirement that the parties' dealing be in the *ordinary* course was not intended to stifle innovative methods of dealing. Sale-and-repurchase agreements are common in other industries, and there

is no reason why they should not spread to van conversion. The term "ordinary course of business" should be interpreted with reference to the purpose of section 9–307(1), which is to protect security interests. The cases cited by the bank are ones in which the deviation from customary modes of dealing created palpable risks to secured lenders or were otherwise irregular in character, as in *Dye* (on which the bank places particular weight), where the dealer bought a car from another dealer but demanded no documents of title and didn't bother to replace his seller's license plates. See also *Rawl's Auto Auction Sales, Inc. v. Dick Herriman Ford, Inc.,* 690 F.2d 422, 428 (4th Cir.1982). We must consider therefore whether a method of selling vans that necessitates delay in the delivery of the certificate of origin has the sort of odor about it that, as a matter of law, takes it out of the ordinary course.

Foy points out that the primary purpose of prompt delivery of the certificate of origin to successive purchasers in the vehicle's chain of title is not to protect security interests but to ensure that the buyer is not getting a stolen car. A thief is unlikely to have the certificate of origin; so if you get the certificate together with the vehicle you have reasonable assurance that there is no thief in your chain of title. Foy concludes that when as with his dealings with Castleman or Castleman's dealings with Ford Motor Company it is unlikely that one's vendor is a thief or a purchaser from a thief, the buyer is apt to be casual about prompt receipt of the certificate of origin; he is confident that he will get it eventually, before or at least when he resells the vehicle. This testimony was in some tension with the district judge's statement that Pennsylvania requires the dealer to deliver the certificate of origin to the state's registry of vehicle titles within ten days after sale; but, the judge added, "according to Mr. Foy's unrebutted testimony, it does not always happen that way." 693 F.Supp. at 750 n. 10.

Foy overlooks the possibility that certificates of origin may have acquired an important secondary purpose, that of helping lenders to protect their security interests in

vehicles by making it more difficult for the owner-borrower to resell the vehicle without notice to the bank. References cited earlier in this opinion suggest that it has become a common method of protecting floor-planning lenders' security interests, in Pennsylvania (Foy's own state) as elsewhere. But as the bank failed to present evidence regarding the frequency with which the method is employed outside of Elkhart, Indiana, we can hardly fault the district judge for accepting Foy's argument. *On this record*—a potentially vital qualification, hence our frenzied emphasis—there is no indication that the practice of banks in keeping certificates of origin is common outside of Elkhart. And if it is not, there would be nothing extraordinary or suspicious about Foy's forbearing to insist that Castleman give him the certificates of origin promptly upon selling him vans that Castleman might soon repurchase—in which event Castleman rather than Foy would need the certificate.

Two weeks after oral argument in this case, the bank asked us to allow it to submit supplemental citations to the record. (The two-week delay is inexplicable.) The citations are to testimony that some floor-planning banks in Pennsylvania do hold the certificates of origin, just like the Indiana banks. (*Fiat Motors* shows the same thing, but was not cited by either party.) The bank simply failed to make a case that the practice of floor-planning lenders in holding certificates of origin is so common that a dealer's failure to insist that his supplier forward the certificate with the vehicle (or immediately afterward) is not in the ordinary course of business.

What we have just said largely answers two of the bank's alternative arguments against the district court's decision. The first is that section 9–307(1) should be interpreted as if it required not only honesty in fact on the part of the buyer (this by incorporation of the definitions of "buyer in ordinary course" and "good faith" in Article 1) but also that the buyer have acted reasonably. Section 2–103(1)(b) of the UCC provides that "in this Article [i.e., Article 2] unless the context otherwise requires ... 'good faith' in the case of a merchant

means honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." The bank argues that this requirement should be imported into section 9–307(1), and that Foy violated it by failing to take minimal precautions to avoid destroying the bank's security interest.

■ The UCC has its share of drafting errors. See, e.g., *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1287–88 (7th Cir.1986). But for the most part it is a carefully drafted statute, and when it offers one definition of good faith applicable to all nine articles of the Code and another definition expressly applicable to one of the articles, we hesitate to apply the specialized definition to one of the other articles. The courts are divided on the question whether Article 2's definition of good faith applies to Article 9, but the majority view, illustrated by *Massey–Ferguson, Inc. v. Helland*, 105 Ill.App.3d 648, 61 Ill.Dec. 142, 434 N.E.2d 295 (1982), is that it does not. See 9 Anderson on the Uniform Commercial Code, *supra*, § 9–307:29 and n. 13. The Indiana courts have not taken sides as yet; *First National Bank v. Crone*, 157 Ind.App. 665, 669–70, 301 N.E.2d 378, 381 (1973), on which the bank relies, is noncommittal.

■ The debate may be much ado about nothing. As noted earlier, a transaction is not in the "ordinary course" under section 9–307(1) if there are grounds for suspicion that a security interest is being imperiled by the mode of dealing. This seems equivalent to requiring that the buyer be acting reasonably in agreeing to a method of dealing proposed by the seller. So we may assume at any rate, for the assumption will not change the outcome here. The record contains no evidence that Foy's failure to insist on prompt delivery of the certificates of origin was unreasonable—once the district judge's findings on credibility are accepted, as the bank acknowledges they must be. We agree with the bank that if a buyer who is seeking to avoid a perfected security interest must act with commercial reasonableness, this implies a division of

responsibility between the secured lender and the buyer for preventing fraud by the borrower-seller. Cf. *Champa v. Consolidated Finance Corp.*, 231 Ind. 580, 594, 110 N.E.2d 289, 295 (1953); *Sterling v. Capital Financial Services, Inc.*, 480 N.E. 2d 605 (1985) (Ind.Ct.App.1985). The lender must take the precautions that are reasonable for a lender to take, and the buyer the precautions that are reasonable for a buyer to take. The bank argues that it took all the precautions that were reasonable for it to take, and Foy none. But the bank failed to make a record in support of its argument. Using preannounced quarterly audits without making any effort to verify the statements that the borrower (Castleman) made in the course of the audits, when verification would have required no more than a phone call to the dealers to whom Castleman said he had entrusted vans that were part of his inventory, fell short of what the bank could reasonably have done to prevent the fraud. The bank knew that Castleman was selling to dealers outside Indiana and should have known that the practice regarding prompt delivery of certificates of origin might vary in different states.

What should Foy have done? He had no reason to believe (always assuming he testified truthfully, as Judge Miller found he did) that Castleman was violating the terms of a loan agreement. He knew that Castleman's inventory was financed by a floor-planning arrangement but he did not know and (we must assume) had no reason to know that the arrangement entitled the bank to hold the certificate of origin for a van until Castleman repaid the bank's loan on the van. It might have been easier for the bank, by a slightly more careful—and not appreciably more costly—audit program, to prevent the fraud than for Foy to have made any effort to do so beyond maintaining ordinary alertness, which the judge found he did.

■ The bank cites an Indiana criminal statute that forbids manufacturers, dealers, or others to sell vehicles without delivering the manufacturer's certificate of origin to the buyer, and, regarding vehicles in their possession, requires that the certifi-cate "shall at all times be readily available for inspection or delivery to the proper persons." Ind.Code § 9–1–2–3(b). The bank says that Foy violated this statute and therefore could not be a buyer in the ordinary course. The scope of the statute, and whether it is intended to apply to non-residents, is uncertain, and these uncertainties have moved the bank to ask us to certify the question of the statute's meaning to the Supreme Court of Indiana in the event that we do not reverse on other grounds. This we decline to do. The statute plainly was intended to impede the trade in stolen vehicles; there is no indication—and the bank does not argue—that it was intended to protect security interests. One could argue that the bank's own insistence on holding the certificates made it an accomplice before the fact in Castleman's and Foy's (alleged) violations, by impeding Castleman in fulfilling his statutory duty to have the certificates of origin at all times readily available to the proper persons, such as Foy, a potential purchaser, although the Indiana Bureau of Motor Vehicles sensibly considers it permissible for lenders to hold certificates of origin. But as the statute is intended to protect purchasers—such as Foy—rather than lenders, there would be considerable paradox in interpreting the statute to defeat his ownership of the vehicles.

■ Turning from liability to damages, the bank argues that Foy failed to mitigate. Recall that the major source of damages is the depreciation of the vans caused by the fact that they cannot be sold without their certificates of origin. Foy offered the bank a deal whereby, in exchange for the bank's releasing the certificates to him, he would place $12,000 of the purchase price of each van, when he sold it, in escrow pending the outcome of this lawsuit. This was his estimate of the average unpaid balance of the bank's loan per van. The bank insisted that Foy place the entire proceeds of the sale in escrow. Foy refused this counteroffer on the ground that he needed a portion of the proceeds to repay his own floor-planner. The bank has failed to explain why it wanted the entire proceeds placed in escrow rather than the amount representing a reasonable estimate

of its lien, so the district judge was right to conclude that Foy had not failed to mitigate his damages. The bank does not argue that Foy should have mitigated his damages in another way—by repaying the bank's loans, getting the certificates of origin, selling the vans, and suing the bank. So we need not decide whether his failure to follow that course might be deemed a failure to mitigate damages.

Last, we rebuke—we more than rebuke, we punish—Foy for his frivolous argument that the bank should be sanctioned for filing this appeal. Although we have ruled against the bank, it is obvious that the appeal is not frivolous—is not, as Foy argues, a frivolous assault on a district judge's credibility findings. Compare *District No. 8 v. Clearing*, 807 F.2d 618, 622–23 (7th Cir.1986). A frivolous request for sanctions is itself sanctionable, *Meeks v. Jewel Cos.*, 845 F.2d 1421 (7th Cir.1988) (per curiam); *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936, 945–46 (7th Cir.1988), and we therefore direct Foy to pay the attorney's fees reasonably incurred by the bank in defending against the request. The bank is directed to submit a verified statement of these fees to the Clerk of this Court within fifteen days.

AFFIRMED.