**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF INDIANAPOLIS,** Defendant-Appellant,

v.

**John S. MUDGETT and Barbara A. Mudgett, Plaintiffs-Appellees.**

No. 1–1077A247.

Court of Appeals of Indiana, First District.

Dec. 11, 1979.

William M. Evans, and Theodore J. Nowacki, Bose & Evans, Indianapolis, Richard T. Lineback, Greenfield, for defendant-appellant.

Robert A. Spray, Indianapolis, Larry C. Gossett, Greenfield, for plaintiffs-appellees.

NEAL, Judge.

Defendant-appellant First Federal Savings and Loan Association of Indianapolis (First Federal) appeals from the entry of judgment upon a jury verdict awarding compensatory and punitive damages to plaintiffs-appellees John S. Mudgett and Barbara A. Mudgett (Mudgetts), upon their claim that First Federal breached a real estate purchase agreement by failing to make the repairs specified therein.

First Federal raises four issues for our review:

1) Whether the trial court erred in overruling First Federal's motion for judgment on the evidence, Ind. Rules of Procedure, Trial Rule 50, with respect to the Mudgetts' claim for punitive damages for breach of a contract to make certain repairs to a dwelling sold by First Federal to the Mudgetts;

2) Whether the verdict awarding $31,600 in punitive damages is contrary to law and not supported by sufficient evidence;

3) Whether the amount of punitive damages awarded is excessive; and

4) Whether the verdict awarding $7,800 in compensatory damages is excessive, contrary to law, and not supported by sufficient evidence.

We affirm in part and reverse in part, finding it necessary to discuss only the second and fourth issues raised by First Federal.

On December 14, 1972, appellant acquired title to a residence pursuant to a foreclosure sale. On January 12, 1973, appellees were shown the property by John Welch, a representative of appellant, and thereafter signed a standard proposition form prepared by Welch. It contained the following phrases:

"repairs—N bathroom leak, leak in furnace room 2 toilet running water, missing Storms and Screens furnace and airconditioning-inspection approval"

The proposition was accepted by appellant on January 15, 1973. An agreement was entered into on April 26, 1973, to supplement the January 12, 1973 agreement as follows:

> "This will confirm our agreement that it is First Federal's responsibility to have performed at reasonable cost on a one-time basis those repairs to the home which you have purchased from us today, as set forth in the purchase agreement between First Federal Savings and Loan Association of Indianapolis and yourselves.
>
> It is also understood that First Federal will undertake to complete the repairs not later than thirty days from the date hereof. We understand that if any complications should arise with respect to the completion of these repairs within the thirty-day period, our respective attorneys will make such different arrangements as may be appropriate."

There were negotiations between the parties relating to adjustment of the purchase price downward with the appellees then assuming the repairs provided for in the agreements, without any agreement being concluded. The sale was closed on April 26, 1973.

On the day of the sale appellees moved into the residence and discovered a leak in an upstairs water pipe. They called appellant who sent a plumber to repair the leak. Over the next several months appellant sent 25 repairmen to the residence and paid $1,232.69 for plumbing, plastering, painting, installation of ceramic tile and drywall, inspection of air conditioning equipment, and installation of 17 new storm windows.

Appellees were not satisfied with appellant's performance of the repair agreement and sent letters to appellant, both personally and through their attorney, demanding further performance. Appellant's attitude was that they had done all they could do and could not satisfy the appellees. The situation degenerated and ultimately litigation was joined. The dispute over appellant's obligations centered primarily around two issues: 1) was the air conditioning system to be merely operable or sufficient to cool the house to a specified temperature, and 2) were the repairs to be done to the satisfaction of the appellees or to the satisfaction of a competent, independent third party. There was evidence that the air conditioner was undersized. However, the written agreement contained no references to capacity. The appellant had not built the home, but had acquired it by foreclosure.

### Issue I: Punitive Damages

First Federal does not appeal from the jury's finding that they breached the contract with the Mudgetts. They argue, however, that punitive damages were inappropriate under the particular circumstances of this case, and that the verdict is contrary to law and not supported by sufficient evidence.

The law which governs the award of punitive damages in contract actions was definitively set out by our Supreme Court in *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976) 264 Ind. 599, 349 N.E.2d 173, 179–181, and bears repeating here:

> "The general rule, recognized in Indiana, *Hibschman Pontiac, Inc. v. Batchelor* (1976), Ind.App., 340 N.E.2d 377; *Standard Land Corp. v. Bogardus* (1972), 154 Ind.App. 283; 289 N.E.2d 803, and throughout the United States, 11 Williston on Contracts § 1340 (W. Jaeger, 3d ed. 1968), is that punitive damages are not recoverable in contract actions. In most contract situations, the rule is a fair one, considering the nature of the interest to be protected. As Dean Prosser notes:
>
>> 'Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract. Even as to these individuals, the damages recoverable for a breach of the contract duty are limited to those reasonably within the contemplation of the defendant when the contract was made, while in a tort action a

much broader measure of damages is applied.' Prosser, Law of Torts, 613 (4th ed. 1971).

The well-defined parameters of compensatory and consequential damages which may be assessed against a promisor who decides for whatever reason not to live up to his bargain lend a needed measure of stability and predictability to the free enterprise system. Thus, a promisor's motive for breaching his contract is generally regarded as irrelevant, *Pirchio v. Noecker* (1948), 226 Ind. 622, 82 N.E.2d 838, because the promisee will be compensated for all damages proximately resulting from the promisor's breach, *Cincinnati & Chi Air Line R. R. v. Rodgers* (1865), 24 Ind. 103. Where the facts surrounding the promisor's breach indicate sub-standard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, but he is not entitled to mulct the promisor in punitive damages.

The general rule is not ironclad. Exceptions have developed where the conduct of the breaching party not only amounts to a breach of the contract, but also *independently* establishes the elements of a common-law tort such as fraud. *Murphy Auto Sales, Inc. v. Coomer* (1953), 123 Ind.App. 709, 112 N.E.2d 589. The requirement that an *independent* tort be found serves several purposes. First, it maintains the symmetry of the general rule of not allowing punitive damages in contract actions, because the punitive damages are awarded for the *tort*, not on the contract. Secondly, the independent tort requirement facilitates judicial review of the evidence by limiting the scope of review to a search for the elements of the tort. Neither of these functions of the independence requirement is very compelling when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort. The foregoing circumstances alone, however, will not sustain the award of punitive damages. *It must* *also appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated.* Only when these factors coalesce, will the independent tort requirement be abrogated, and the allowance of punitive damages be sustained. A careful review of the case law in this area leads to the conclusion expressed herein, that an independent tort need not always be established, and the same conclusion is reached in Corbin's treatise:

'It can be laid down as a general rule that punitive damages are not recoverable for breach of contract, although in certain classes of cases, there has been a tendency to instruct the jury that they may award damages in excess of compensation and by way of punishment. These cases, however, are cases that contain elements that enable the court to regard them as falling within the field of tort *or as closely analogous thereto.*' 5 Corbin on Contracts § 1077 (1964) [emphasis added, footnotes omitted].

The standard for awarding punitive damages is necessarily a flexible one. Indiana case law follows Sedgwick's formulation which appears in *Taber v. Hutson* (1854), 5 Ind. 322, 324:

"[W]henever the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, it blends together the interest of society and of the aggrieved individual, and gives damages not only to recompense the suffer [sic], but to punish the offender.' [Emphasis added.]

Sedgwick's recognition that the lines between contract and tort often become blurred is aptly demonstrated by his choice of the word 'mingle' in describing the presence of tortious activity which

accompanies the breach of contract. This formulation clearly recognizes that an independent tort is not a prerequisite to the recovery ·of punitive damages, and we adhere to this standard as a wise one." (Original emphasis.)

■ Without question, to allow punitive damages in addition to compensatory damages in a contract action is to follow the exception and not the general rule. This exception is restricted to those instances in which the evidence: (1) independently establishes the elements of a common law tort, or (2) shows that a serious wrong, tortious in nature, has been committed in an instance in which the public interest would be served by the deterrent effect punitive damages would have upon the future conduct of the wrongdoer and parties similarly. situated.

An award of punitive damages in a contract action is based on findings which place stress on the defendant's state of mind. "The Expanding Availability of Punitive Damages in Contract Actions," 8 Indiana Law Review 668 (1975).

■ Under the first basis of recovery under *Vernon, supra,* there must be evidence to support a finding that the defendant committed an intentional tort independent of the breach of contract. To establish the common law tort of fraud or deceit, the evidence must show several elements including the false representation of a fact accompanied by the knowledge or belief that the representation was false, or evidence that a promise was made contemporaneously with a lack of intention to keep it. *Kidd v. Kidd* (1968) 143 Ind.App. 648, 242 N.E.2d 385.

Under the second basis of recovery under *Vernon, supra,* there must be evidence of "fraud, malice, gross negligence or oppression" mingled in the controversy.

Fraud is defined as:

"The intentional deception, relied upon by another which induces him to part with property or surrender a legal right. . ."

*Guy v. Schuldt* (1956) 236 Ind. 101, 138 N.E.2d 891.

or as:

"A generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth, and includes all surprise, truck, cunning, dissembling, and any unfair way by which another is cheated." Black's Law Dictionary 788 (rev. 4th ed. 1968).

Malice is:

"The intentional doing of a wrongful act without just cause or excuse with an intent to inflict an injury or under circumstances that the law will imply an evil intent." Black's Law Dictionary 1109 (rev. 4th ed. 1968).

Oppression is defined in *Vernon, supra,* 349 N.E.2d at 184, as:

"An act of cruelty, severity, unlawful exaction, or excessive use of authority."

Gross negligence is equated with fraud, malice and oppression in *Prudential Ins. Co. v. Executive Estates* (1977) Ind.App., 369 N.E.2d 1117, where Judge Buchanan also discussed at great length the allegation of "heedless or reckless disregard of the consequences," which was also pleaded by the plaintiffs in the case at bar. Judge Buchanan said, in 369 N.E.2d at 1131–1132:

"That a heedless or reckless disregard of consequences will support punitive damages is recognized in principle more than actuality . . . the phrase being enumerated along with other descriptive terms in cases dealing with more oppressive behavior of the wrongdoer. See, e. g., *Nicholson's Mobile Home Sales, Inc. v. Schramm* (1975), Ind.App., 330 N.E.2d 785; *Lou Leventhal Auto Co., Inc. v. Munns* [(1975), Ind.App., 328 N.E.2d 734], *supra.*

The phrase also appears to be used as an alternative to the description of more oppressive conduct. *Harness v. Steele* (1902), 159 Ind. 286, 64 N.E. 875; *Citizens' Street R.R. v. Willoeby* (1893), 134 Ind. 563, 33 N.E. 627.

When specific conduct has been characterized as a heedless or reckless disregard of consequences, the conduct would appear to be more accurately characterized as a conscious and intentional wrongdoing better described by such words as oppression or malice. In *Bob Anderson Pontiac, Inc. v. Davidson* (1973), 155 Ind. App. 395, 400, 293 N.E.2d 232, 235, the facts centered on consumer fraud (altered automobile odometer and misrepresented condition) which the court also characterized as a 'negligent or wilful misrepresentation of a material fact inducing the entry into a contract.' *Capitol Dodge, Inc. v. Haley* (1972), 154 Ind.App. 1, 288 N.E.2d 766 likewise dealt with consumer fraud—inducing a sale by promising non-existent insurance coverage.

In two cases in which the court spoke *only* of a heedless disregard of consequences, a more conscious and direct type of behavior was nevertheless included. The wrongdoer in *True Temper Corp. v. Moore* (1973), 157 Ind.App. 142, 299 N.E.2d 844, bought and cut standing timber from a seller known not to own the land. The wrongdoer's conduct in *Jones v. Hernandez* (1970), 148 Ind.App. 17, 263 N.E.2d 759, was just as direct and conscious . . . charging an electric fence with 110 volts to keep neighboring farm laborers away.

So it seems reasonable to conclude that something more than a state of mind described as heedless disregard of the consequences is required to justify imposition of punitive damages. The cases seem to have dealt with a state of mind demonstrating actual malice or a wantonness from which the law could imply malice. None in Indiana have [sic] yet gone so far as to support or award punitive damages solely on the basis of a concept of heedless disregard of the consequences, which might also be described as constructive malice.

Prudential's conduct, measured by any of these standards, falls short of constituting an independent tort of such a reprehensible nature as to justify imposition of punitive damages.

\* \* \* \* \* \*

However, our inquiry does not cease with the determination that Prudential's conduct does not evidence an independent tort of a reprehensible nature. We must also ask whether 'elements of fraud, malice, gross negligence or oppression mingle' with the breach of the contractual promises made by Prudential so as to support an award of punitive damages. See *Hibschman Pontiac, Inc. v. Batchelor* (1977), Ind., 362 N.E.2d 845; *Vernon Fire & Cas. Ins. Co. v. Sharp* (1976), Ind., 349 N.E.2d 173; *Joseph Schlitz Brewing Co. v. Central Beverage Co., Inc.*, Ind.App., 359 N.E.2d 566; *Jones v. Abriani* (1976), Ind.App., 350 N.E.2d 635.

An analysis of these cases forces the conclusion that the 'tortious conduct' involved is indicative of a state of mind evidencing bad faith: auto dealer avoiding repairs until warrant period expired (*Hibschman*); insurer refusing to pay claimant as means of forcing a third party settlement (*Vernon*); brewer terminating agreement with liquor wholesaler in violation of statute (*Joseph Schlitz Brewing Co.*); seller refusing to return deposit upon buyer's rejection of defective mobile home (*Jones*).

Again, Prudential's behavior by any fair appraisal falls short of 'fraud, malice, gross negligence, or oppression.' Gross negligence as such, used in this context, has not been defined, but it is reasonable to assume that it refers to the same kind of oppressive conduct symbolized by fraud or malice. See 25 C.J.S. *Damages* § 123(8), at p. 1147 (1966)." (Footnotes omitted, our emphasis.)

We also deem it useful to quote extensively from the thoughtful concurrence of Judge Garrard in *Hibschman Pontiac, Inc. v. Batchelor* (1976) Ind.App., 340 N.E.2d 377, transfer granted by the Supreme Court in *Hibschman Pontiac, Inc. v. Batchelor* (1977) Ind., 362 N.E.2d 845, in an opinion that disagreed with the Court of Appeals' application of the law to the facts but not with its summary of relevant law.

Judge Garrard said, in 340 N.E.2d at 384–385:

"An examination of prior Indiana decisions as to when punitive damages may be awarded leads to two conclusions.

First, while the decisions refer to such descriptive terms as malice, gross fraud, oppressive conduct, wantonness, heedless disregard of the consequences, insult, violence, abuse and outrageous conduct, this language is intended as *descriptive* rather than *definitive.*

Not only do the terms recited vary somewhat from case to case, they are sometimes used conjunctively (*See, Murphy Auto Sales, Inc. v. Coomer, supra*), and sometimes disjunctively. (*See, Jeffersonville Silgas, Inc. v. Wilson* (1972), Ind.App., 290 N.E.2d 113.) This is emphasized in *Wheatcraft v. Myers* (1914), 57 Ind.App. 371, 378, 107 N.E. 81, and again in *Murphy Auto Sales, supra,* where the courts stated,

'. . . [W]here malice, fraud, oppression, etc. enter into a tort, exemplary damages may be assessed.' (Emphasis added)

Secondly, at the core of these descriptions is a consideration of the quality of the actor's conduct that characterizes it as reprehensible. It embodies a consciousness of intended or probable effect calculated to unlawfully injure the personal safety or property rights of others. In some instances it may consist of the conscious desire to maximize rather than mitigate the amount of injury suffered.

If one were to select a single word or term to describe this essence, it would be 'malice.' To warrant punitive damages the tort complained of must be committed maliciously. The malice may be actual or constructive. Actual malice may be express or implied.

Malice may be implied from commission of the tort in a violent, abusive, insulting or oppressive manner.

Constructive malice exists where the act or conduct is performed in such a reckless or wanton manner that the law will imply malice from the nature of the conduct and the actor's heedless disregard of the consequences and the rights of others." (Footnotes omitted, original emphasis.)

■ Courts have long recognized that a good faith dispute as to what a contract requires of a party will never supply the grounds for punitive damages, *Jones v. Abriani* (1976) Ind.App., 350 N.E.2d 635; that the legitimate exercise of the "right to disagree" may directly result in intentional infliction of temporal damage; but that the infliction of such damage is generally regarded as privileged, *Vernon, supra.* Courts must be careful not to discourage honest litigation by allowing punitive damages against a party who is merely exercising his right to adjudicate an honest dispute even if he is found to be in error and even if his litigation injures the other party. 8 Ind.Law Review 668, *supra.* In *Vernon, supra,* we also stressed that a promisor's motive for breaching his contract is generally irrelevant and that even a breach indicating substandard business conduct does not entitle the promisee to mulct the promisor in punitive damages.

■ On the other hand, as Judges Buchanan and Garrard have emphasized, punitive damages are appropriate where there is evidence of an independent tort of a 'reprehensible' nature, where the record indicates a state of mind evidencing bad faith, or where the actor's conduct has a quality that characterizes it as "reprehensible" as where there is evidence of a consciousness of an intended or probable effect calculated to unlawfully injure the personal safety or property rights of others. *Hibschman Pontiac, supra; Vernon, supra.* Such conduct is not privileged.

■ In the case at bar, the evidence of events reflects casual discussion of defects, imperfectly remembered conversations, questions of judgment as to the extent of damages to be repaired, varying degrees of expertise necessary to satisfy plaintiffs, forgotten details, an ambiguous memorandum hastily drawn, bad tempers and delays. Much of the evidence recited in appellees' brief in support of punitive damages con-

sists of characterization of events rather than the events. Appellees use such phrases as "dangling the keys and pulled them out of my reach" at the closing, "sprung upon the Mudgetts repair-waiver documents," "First Federal assigned a moonlighter," and were "rude" to Mudgetts. While the evidence most favorable to plaintiff demonstrates sufficient evidence to sustain an action for breach of contract, it does not raise to the sufficiency required for punitive damages.

We find nothing in the facts that can be described as an intentional tort, fraud, deceit, false representation, gross negligence or oppression mingled with the controversy. We cannot find sufficient evidence of conduct on the part of First Federal which could be characterized as reprehensible or tortious. If the evidence adduced at trial were held to be sufficient to support a judgment for punitive damages, the exception delineated in *Vernon, supra,* would swallow the rule, the line between actions in contract and actions in tort would be erased, and years of thoughtful jurisprudence would have gone for naught. We hold, as a matter of law, that the evidence is insufficient to support an award of punitive damages.

Issue II: Compensatory Damages

First Federal argues that the award of $7,800 in compensatory damages is excessive because that amount is beyond the scope of the evidence and because it includes an award of compensatory damages for the total replacement of the air conditioning in the Mudgetts' home when the need for such replacement was not shown to be damage that resulted from any breach of contract on the part of First Federal.

First Federal concedes damages in the amount of $5,232.50 representing the out-of-pocket expenses actually incurred by the Mudgetts in purchasing certain materials, the Mudgetts' time in making repairs and in various other activities relating to re-

pairs, and the estimate of the cost of repairing the bathroom leak.

In *Prudential, supra,* we reiterated that:

"[T]he general rule is that the amount of damages awarded must be within the scope of the evidence. See e. g., *Wolff v. Slusher* (1974), Ind.App., 314 N.E.2d 758; *Northern Indiana Pub. Serv. Co. v. Otis* (1969), 145 Ind.App. 159, 250 N.E.2d 378; *Allison v. Boles* (1967), 141 Ind.App. 592, 230 N.E.2d 784; *First Bank & Trust Co. v. Tellson* (1954), 124 Ind.App. 478, 118 N.E.2d 496."

The record shows the following evidence most favorable to a compensatory damage award in relation to the air conditioning system. Mr. Mudgett testified that he raised the issue of the air conditioning system's cooling capacity during the January 12, 1973, tour of the house, and that Welch's comments as he prepared the agreement were to the effect that First Federal would guarantee a cooling capacity that would meet the Mudgetts' approval. Mudgett further said that, in preparation for trial, he secured estimates that it would cost $2,386 to overhaul the system to guarantee a temperature inside the house of 75 degrees, plus or minus three degrees, when the outside temperature was 95 degrees, and $2,514 to guarantee 70 degrees, plus or minus two degrees, when the outside temperature was 90 degrees. The jury could reasonably infer that the latter guarantee would be required to meet the Mudgetts' approval and, thus, the evidence supports the further award of $2,514.[1]

We cannot concur with appellant's view that the compensatory damage award is excessive. It was for $7,800. The evidence summarized above shows damages of $7,746.50.

In *Balue v. Taylor* (1893) 136 Ind. 368, 36 N.E. 269, the Supreme Court let stand a verdict for $5,523 when the evidence showed damages of $5,516. The court recognized that over five years had elapsed between the breach of the contract and the

1. The appellees were in error in their brief when they stated that an estimate from Sears, Roebuck & Co. was "roughly $3,000 plus instal-lation." The record shows that Mr. Mudgett testified that the Sears estimate was "roughly about a Thousand Dollars plus installation."

verdict and implied that the jury could reasonably have made a damage allowance for interest for a total recovery of as much as $5,917.50.

In the case at bar, the contract was to be performed by not later than 30 days after April 26, 1973, and the verdict was returned on February 23, 1977. The Mudgetts' out-of-pocket expenses were incurred over this almost four-year interval. The jury could reasonably have allowed some interest by rounding the measure of damages to the nearest $100.

That part of the judgment awarding punitive damages is reversed; that part of the judgment awarding compensatory damages is affirmed.

Reversed in part; affirmed in part.

LOWDERMILK, P. J., and ROBERTSON, J., concur.