C. Benjamin FOY, d/b/a Ben Foy Motors, Plaintiff,

v.

**FIRST NATIONAL BANK OF ELKHART, Defendant.**

No. S87–68.

United States District Court, N.D. Indiana, South Bend Division.

June 6, 1988.

Richard D. Bonewitz, South Bend, Ind., for plaintiff.

R. Michael Parker, Cassidy C. Fritz, Elkhart, Ind., for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This case came before the court on February 29 and March 1, 1988 for trial on the plaintiff's complaint and the defendant's counterclaim. This memorandum opinion is intended to comply with the requirements of Fed.R.Civ.P. 52.

## I. FACTS

The plaintiff, C. Benjamin Foy, is a citizen of the Commonwealth of Pennsylvania, where he does business as Ben Foy Motors. The defendant, First National Bank of Elkhart ("the Bank") is a national banking association organized under the laws of the State of Indiana, where its principal place of business is located. The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

## A. Olin Castleman, Conversion Marketing and the Bank (Part 1)

Olin Castleman[1] is an Indiana resident who was engaged in the business of converting vans for sale. During 1985 or 1986, Mr. Castleman incorporated his business as Conversion Marketing, Inc. Mr. Castleman or Conversion Marketing would order van chassis from dealers for conversion. Dealers might deliver the chassis directly to Conversion Marketing, or Conversion Marketing might pick the chassis up from the dealer. After "converting" the van, Conversion Marketing would either re-sell the converted van to the dealer or attempt to sell it through some other means.

### 1. The Floor Plan Loan

On August 20, 1985, the Bank provided a $150,000.00 "floor plan" line of credit to Mr. Castleman. To secure the "floor plan", the Bank had Mr. Castleman execute security agreements under which the Bank obtained a security interest in Mr. Castleman's inventory, accounts receivable, equipment and other property, including all after-acquired property of the same nature and description. On August 23, 1985, the Bank perfected its security interest by filing a valid and enforceable financing statement with the Secretary of State's office in Indiana.

### 2. The Certificates of Origin

A certificate of origin is a document relating to a motor vehicle that has not been titled. The vehicle manufacturer issues the certificate of origin upon production of the vehicle. When the vehicle is sold at retail, the seller sends the certificate of origin to the state agency that issues title to the retail purchaser.

Under Mr. Castleman's "floor plan" arrangement with the Bank, Mr. Castleman would deposit certificates of origin with the bank in exchange for a specific advance on his line of credit approximately equal to the purchase price of the van. The Bank then

---

1. As is explained below, Mr. Castleman appears to have defrauded the Bank and Mr. Foy alike. The court cannot evaluate Mr. Castleman's state of mind during the waning days of his business, but by the time Mr. Castleman testified at this trial, his shame was apparent. He appeared to prefer not to remember the events of those days, and sought to conclude his testimony as quickly as possible. Based on Mr. Castleman's demeanor at trial and his conduct as shown by the evidence at trial, the court finds him to have been an incredible witness. Except to the extent his testimony was corroborated or undisputed, the court has attributed no weight to it.

would hold the certificates of origin until Mr. Castleman came to the bank and made a payment against his line of credit; upon payment, the Bank would release the appropriate certificate of origin to Mr. Castleman. The Bank would not know to whom Mr. Castleman had sold the van.[2] The Bank does not engage in spot checks of its accounts to determine the source of payments to its debtor. As a result of the "floor plan audits" discussed below, however, the Bank was aware that Mr. Castleman dealt with dealers outside Indiana.

Mr. Castleman also could take a certificate of origin "on trust": the Bank would release a certificate of origin to Mr. Castleman after he signed an agreement stating that he was taking the certificate to consummate a sale and that he would return the certificate or pay the Bank within a fixed period of time.[3] According to Bank Vice–President Randall Foster, who also acted as Mr. Castleman's loan officer, a Bank borrower may have certificates of origin "out on trust" equal to ten to twenty percent of the units covered by the floor plan.

Indiana's Bureau of Motor Vehicles, which requires that dealers make certificates of origin available for its inspection, does not deem it impermissible for banks to hold the certificates of origin for financed vehicles.

## B. Olin Castleman and Ben Foy (Part 1)

### 1. Mr. Foy, Ben Foy Motors and Gene Turner

Mr. Castleman first met Ben Foy at an auto auction on November 8, 1985. Mr. Foy, who was born and raised in Pennsylvania, had been in the automobile business since 1959 and had worked for himself since 1965. He is and was a licensed used car dealer in Pennsylvania, operating a business called Ben Foy Motors. Ben Foy Motors began selling converted vans in late 1984.[4] Ben Foy Motors would buy vans at auction or directly from converters who would deliver the vans to the Bedford, Pennsylvania lot of Mr. Foy's lifelong friend, Gene Turner. The firm of Turner & Feight[5] owns that lot. Under the verbal arrangement between Mr. Turner and Mr. Foy, Ben Foy Motors pays for the van with a check[6] and Mr. Turner markets the vans. Mr. Foy and Mr. Turner's corporation split the sale profits evenly. No dealer within sixty miles of Bedford, Pennsylvania sells more vans than Mr. Foy and Turner & Feight sell.

Ben Foy Motors finances its vans through Mr. Foy's "floor plan" with the First National Bank of Everett, Pennsylvania. When a van is received, Mr. Turner calls Mr. Foy, who goes to his bank and signs a trust receipt for that van; Mr. Foy's bank then credits his account to cover the check Mr. Foy issued for the van. Mr. Foy's bank requires no additional collateral of him.[7] Mr. Foy does not deliver the certificate of origin to his bank when he purchases a van, nor does he deliver a certificate of title to his bank when he purchases a used car. He is unaware of other dealers' financing arrangements.

Mr. Turner also has an open line of credit with his bank; his bank holds neither cer-

2. The Bank does not require its debtor van converters to furnish the Bank with the names of its dealers, and the Bank does not require that checks be made payable jointly to the van converter and the Bank.

3. The Bank presented evidence that at least one other area financial institution, the Valley American Bank, follows this procedure for securing floor plan loans to van converters.

4. By the time of trial, Mr. Foy had purchased from eighteen to twenty van converters, all from outside Pennsylvania.

5. Mr. Turner owns fifty-one percent of the stock of this business; Mr. Foy owns none. Turner & Feight, Inc. has been licensed as a used car dealer in Pennsylvania since 1969.

6. More often than not, when a van is to be delivered, Mr. Foy provides Mr. Turner with a signed Ben Foy Motors check. Mr. Turner then fills out the check and exchanges it for the van upon delivery.

7. Mr. Foy's bank has required other car dealers to provide certificates of origin as collateral for floor plan loans, however; in those instances, the certificates are shipped directly from the manufacturer and the bank issues a direct draft to the manufacturer.

tificates of origin nor certificates of title of the vehicles. Mr. Turner knew that banks in his area hold certificates of title, and he was aware from prior experience that some banks hold certificates of origin as collateral.[8]

### 2. The "5 Plan"

Ben Foy Motors' first purchase of a converted van from Mr. Castleman occurred on October 25, 1985 at an auction; Mr. Foy dealt with a salesman other than Mr. Castleman. When Mr. Foy met Mr. Castleman at the auto auction on November 8, 1985, he purchased another converted van from Mr. Castleman. Thereafter, Mr. Foy bought vans from Mr. Castleman directly at Mr. Turner's Bedford lot. Mr. Foy would request some vans specifically; on other occasions, Mr. Foy would buy vans that Mr. Castleman would bring to the lot.

When Mr. Foy made his next van purchase from Mr. Castleman, Mr. Castleman suggested that Mr. Foy get on the "5 or 10 plan". Mr. Castleman explained that under his "5 plan", if Mr. Foy agreed to keep five of Mr. Castleman's vans in inventory, Mr. Castleman would (1) pay part of Mr. Foy's floor plan interest part of the year, (2) pay all of Mr. Foy's floor plan interest during the winter months, and (3) agree to buy back and replace vans that Mr. Foy was unable to sell. Mr. Foy agreed to join the "5 plan", but Ben Foy Motors' inventory did not reach five vans until January 4, 1986. When vans were delivered to the Bedford lot, Mr. Turner or Mr. Foy would pay for the vans with a Ben Foy Motors check.

### a. Mr. Castleman, Mr. Foy and the Certificates of Origin

It is unclear from the evidence when Ben Foy Motors received the certificates of origin for the first two vans purchased. Mr. Foy testified that they were received in the "due course of time"; that description is unhelpful in light of the evidentiary dispute discussed below. In any event, however, when the "5 plan" was implemented, Ben Foy Motors would not receive the certificates of origin until it sold the van.[9] Upon sale, Ben Foy Motors would call Mr. Castleman or Conversion Marketing to ask for the certificate of origin, which would arrive a day or two later.[10] If Mr. Castleman was travelling, however, it could take additional time to contact him.[11] On one occasion, Ben Foy Motors did not receive the certificate of origin until more than thirty days after the sale of the van and the request that Conversion Marketing send the certificate. After the first two purchases, Ben Foy Motors received certificates of origin from Mr. Castleman or Conversion Marketing only upon specific request.

This arrangement, whereby Ben Foy Motors would not receive the certificate of origin before sale, apparently was intended to facilitate the "buy back" provision of the "5 plan". From time to time, Conversion Marketing would repurchase vans for which Ben Foy Motors had paid; a Conversion Marketing check to Ben Foy Motors, drawn on the Bank, would be issued. Apparently, there was some concern that the certificate of origin would be filled to capacity with transfers from Conversion Marketing to Ben Foy Motors and back again.[12]

---

**8.** Mr. Turner testified in his deposition that the experience with Conversion Marketing has not led him to inquire whether others with whom he and Mr. Foy deal have floor plan arrangements involving certificates of origin similar to that employed by the Bank.

**9.** Ben Foy Motors received one van, a 1986 Chevrolet, VIN 2GBEG25H4G4159200, on July 12, 1986, for which it never received a certificate of origin from Conversion Marketing. That van remains in Ben Foy Motors' inventory, and is among the ten vans at issue in this case.

**10.** Pennsylvania requires dealers to send paperwork (including a certificate of origin) to the

commonwealth's titling office within ten days of the sale. According to Mr. Foy's unrebutted testimony, it does not always happen that way.

**11.** When inquiring of other dealers, Mr. Foy learned that others complained of difficulty in contacting Mr. Castleman with warranty questions or requests.

**12.** Testimony at trial did not resolve whether Conversion Marketing simply could have given Ben Foy Motors the certificates in blank, not to be completed in the event of a repurchase.

Ben Foy Motors took Conversion Marketing vans on a straight consignment basis six times. Ben Foy Motors sold one of those vans, and Mr. Castleman then sent the certificate of origin when Ben Foy Motors sent its check.

### b. Other Converters and Certificates of Origin

Most, but not all, van converters deliver the certificate of origin nearly contemporaneously with payment for a converted van. The Bank called Scott Jacobsen of Jordan Ford, the world's largest Ford dealer, who testified that this practice is universal; if the certificate of origin is not provided, Mr. Jacobsen testified, Jordan Ford does not pay for the van because it does not own the van without the certificate of origin. John Pfanzelt, president of Wedge Conversions (another converter from which Ben Foy Motors buys vans) testified that his bank holds certificates of origin pursuant to his financing arrangements. In most transactions, Wedge takes the certificate of origin "on trust" to deliver with the van; on other occasions, Wedge sends the certificate of origin to the purchaser by Federal Express after the sale, and the purchaser receives the certificate less than a week after the purchase.

Mr. Foy and Mr. Turner testified at trial that in all their purchases of converted vans, they received the certificate of origin with the van only "a handful of times",[13] regardless of the converter with whom they dealt, and that they normally would not receive the certificate of origin until one to five [14] weeks after the sale. As credible as the court found Mr. Foy and Mr. Turner, the court simply cannot, in light of the evidence the Bank presented, accept this testimony. The court finds that some, but not all, van converters provide the certificate of origin fairly contempora-

neously with delivery of, and payment for, the van.

### 3. Other Arrangements Between Ben Foy Motors and Converters

Ben Foy Motors had no arrangement with any other van converter quite like its "5 plan" with Mr. Castleman. Some other converters would leave vans with Ben Foy Motors, not to be paid until sale, and then with modest interest; others left vans with Ben Foy Motors on a straight consignment basis; others allowed Ben Foy Motors to hold the unit up to ninety days without paying interest on the "conversion" portion of the price.

### C. Olin Castleman, Conversion Marketing and the Bank (Part 2)

#### 1. The Increased Credit Line

In the meantime, on February 20, 1986, at Mr. Castleman's request, the Bank increased Mr. Castleman's floor plan line of credit to $300,000.00. Thereafter, Mr. Castleman incorporated Conversion Marketing and the Bank opened a new line of credit for Conversion Marketing and had Conversion Marketing execute new security agreements under which the Bank obtained a security interest in the same types of property Mr. Castleman formerly owned: inventory, accounts receivable, equipment and other property, including all after-acquired property of the same nature and description. The Bank perfected its security interest in that property by filing a valid and enforceable financing statement with the Secretary of State's Office in Indiana. The Bank did not learn of the "5 plan" with Ben Foy Motors until February, 1987.

#### 2. The Floor Plan Audits

The Bank engaged in "floor plan audits" of Mr. Castleman's inventory. Mr. Castle-

---

**13.** Mr. Foy testified that contemporaneous delivery occurred less than a handful of times. Mr. Turner testified that there were no converters with whom he dealt who delivered the certificate of origin at the time the van was delivered and paid for.

**14.** Mr. Foy testified that most converters would not deliver the certificate of origin for an aver-

age of two to three weeks. At his deposition, his estimate was seven to ten days. At trial, he gave an example of one Elkhart converter who would take a month to five weeks to deliver the certificate of origin. Mr. Turner testified that van converters other than Conversion Marketing would deliver the certificate of origin up to four to six weeks after delivery.

man was to have his vans on his premises, although the Bank had no general fixed policy or procedure to be followed if inventory was not on premises. At his deposition, Mr. Foster testified concerning his personal procedure with respect to Mr. Castleman: if the floor plan audit disclosed that the vans were not on premises, the Bank would discuss the problem with Mr. Castleman and tell him the Bank needed to account for the missing vehicles within the next few days. Bank personnel then would attempt to verify the vans' reported whereabouts. Mr. Turner testified that nobody from the Bank ever contacted him to verify his possession of Conversion Marketing vans.

As a general rule, when the Bank conducts floor plan audits of van converters, vans not on the premises are at auctions or dealerships or being used as demonstration models. Occasionally, the Bank finds that a converter has a vehicle out on consignment to a dealer who has not paid for the van, which is inconsistent with the Bank's floor plan policy. No Bank procedure establishes the frequency of floor plan audits. The loan officer or the approving Bank committee determines frequency, depending on the debtor's financial stability. The Bank conducted quarterly floor plan audits with respect to Mr. Castleman.[15]

Mr. Castleman's "5 plan" did not fit comfortably within the Bank's requirement that he maintain on his premises those vans covered by his floor plan.

### a. The March Audit

When the Bank conducted its March, 1986 floor plan audit of Mr. Castleman's business, it found that nineteen of the twenty-six vans covered by the "floor plan" were not in Elkhart. Mr. Castleman told the Bank's auditor where the other vans were located. The following day, Mr. Foster met with Mr. Castleman and reminded him that when the Bank conducted its audits, it expected to find the vans. Mr.

Castleman told Mr. Foster that the vans were "out there" for sale. The Bank verified that the vans were where Mr. Castleman said they were.

### b. The May Audit

When the Bank conducted its May, 1986 floor plan audit, it found nine of the expected twenty-two vans at the Conversion Marketing premises. The Bank considered this an improvement over the previous audit, however, because several of the vans were "in trust" (meaning that Mr. Castleman had signed the certificates of origin out of the Bank's possession for purposes of sale) and a few others were being paid off.

### c. The July Audit

At the July, 1986 audit, the Bank found ten vans present at Conversion Marketing of the twenty-six covered by the floor plan. Three other vans were at the premises of another converter in the Elkhart, Indiana area. The Bank auditor verified the whereabouts of the other vans by telephone: four were in Chicago, two were in Phoenix and one was in Minnesota.

### d. The October Audit

At the October 31, 1986 floor plan audit, the Bank found nine vans at Conversion Marketing of the twenty-eight on the floor plan. Six vans reportedly were elsewhere; seven were "on trust". Mr. Castleman told the Bank's auditor, Deborah Burton, where the other vans were located. She returned to the Bank to make telephonic verification of what Mr. Castleman told her. She was able to verify the location of five of the vans. Before she reached Mr. Foy, Mr. Foster told her that Mr. Castleman, rather than Bank personnel, should be making the effort to locate the vans. At Mr. Foster's direction, Ms. Burton told Mr. Castleman to bring the other vans back to his premises; Mr. Castleman agreed to do so. Mr. Castleman brought five vans back and showed

---

**15.** Another area financing institution that deals with van converters engages in floor plan audits about three times every two months. During its unannounced audits, that institution may find from fifteen to twenty-five percent of the financed units not on the premises. That institution's loan department becomes quite concerned if more than half of the units are not accounted for.

them to Ms. Burton. He did not bring back two of the vans listed as being in Pennsylvania; instead, he paid those vans off on November 24, 1986. The Bank deemed the results of the October audit to be more in compliance with Bank policy than was the March audit.

On a few occasions, Mr. Castleman came to the Bedford lot on his way to another dealer's lot, and asked whether he could take any vans that were not selling to try to sell them to the other dealer. On one occasion, he took vans to a dealer show. When he would take vans for such purposes, Mr. Castleman would leave signed Conversion Marketing checks for each van with Mr. Turner in case the van sold or harm befell Mr. Castleman. Mr. Castleman never told Mr. Turner or Mr. Foy that he was taking vans back to Indiana for a floor plan audit, but that apparently is what Mr. Castleman did: several of the vans "sold" to Ben Foy Motors before the October audit, and now in Ben Foy Motors' possession, were identified by Bank personnel at Conversion Marketing in November.

D. Olin Castleman and Ben Foy (Part 2)

### 1. The "10 Plan"

Mr. Foy and Mr. Turner visited Conversion Marketing in Indiana in early November, 1986.[16] During the November visit, Mr. Turner asked Mr. Castleman about the "10 plan", and Mr. Castleman again explained that if Ben Foy Motors kept ten Conversion Marketing vans in inventory, Conversion Marketing would pay all of Ben Foy Motors' interest on those vans throughout the year, and still would maintain the repurchase agreement. The plan sounded good to Mr. Turner and Mr. Foy, but they remained uncertain as to whether or not they wanted to keep ten Conversion Marketing vans. Mr. Foy purchased a

Conversion Marketing van while in Indiana in November, 1986.

In early December, 1986, Mr. Foy and Mr. Turner decided to join the "10 plan", and so informed Mr. Castleman.[17] Ben Foy Motors then had four Conversion Marketing vans; Mr. Castleman agreed to repurchase and replace three of them and to send Ben Foy Motors nine additional vans over time. On December 18, Mr. Castleman brought two vans to Bedford and took back one. On December 24, Mr. Castleman brought three vans to Bedford and took back two. On each occasion, Mr. Castleman received Ben Foy Motors checks for the vans he brought and provided Conversion Marketing checks for the vans he took. The tenth van did not arrive in Ben Foy Motors' inventory until January 14, 1987.

### 2. The Collapse

One of Mr. Castleman's December 24 checks was returned to Mr. Foy for insufficient funds.[18] Claiming he would "cover" the check, Mr. Castleman brought another check to Ben Foy Motors with the January 14, 1987 delivery of the tenth van; that check, too, was returned for insufficient funds. Sometime around January 22–24, Mr. Foy again called Mr. Castleman, who said there had been a mix-up, and he would send another check. Mr. Foy, now suspicious that someone else might hold the certificates of origin, asked Mr. Castleman to bring the certificates of origin with him when he brought the next check. Mr. Castleman said he didn't believe he could bring all of the certificates because "two or three" were "in the Bank".

Mr. Castleman mailed Mr. Foy a third check; Mr. Foy received it around January 28. That check, too, was returned for insufficient funds. On Saturday, January

---

**16.** Mr. Foy had visited Conversion Marketing once before, on a weekend in or around March, 1986 while visiting several area van converters; he did not speak to Mr. Castleman on that visit.

**17.** No other Conversion Marketing customer participated in the "10 plan".

**18.** This was not the first instance of a check from Mr. Castleman being dishonored. In July, 1986, two Conversion Marketing checks issued

to Ben Foy Motors for the repurchase of vans had been returned for insufficient funds. Mr. Foy called Mr. Castleman, who expressed surprise and told Mr. Foy to retender the checks. Mr. Castleman said he would have the Bank call Mr. Foy. Sue Ann Schmeling of the Bank then called Mr. Foy with apologies, saying it had been the Bank's error. Ms. Schmeling then sent Mr. Foy a letter confirming the Bank's error.

31, Mr. Castleman called and asked to meet with Mr. Foy the following day. On February 1, Mr. Castleman told Mr. Foy and Mr. Turner that the Bank had frozen Conversion Marketing's account on January 30, and that the ten vans at the Bedford lot were all on Conversion Marketing's floor plan with the Bank.

This was the first indication to Mr. Foy that the Bank held all of the certificates of origin. Mr. Castleman believes, but the court does not find, that he had told Mr. Foy earlier that some of the certificates were "at the Bank", although he concedes that he only assumed that Mr. Foy would understand that to mean that the certificates of origin were held as security for Conversion Marketing's floor plan. Mr. Castleman also testified, however, that he had told Mr. Foy that he had several certificates of origin in his desk drawer.

### E. Olin Castleman, Conversion Marketing and the Bank (Part 3)

On February 2, 1987, Conversion Marketing was indebted to the Bank in the principal amount of $300,000.00 and was in default of its obligations to the Bank, which took possession of its collateral held by Conversion Marketing. It appears that Conversion Marketing ceased doing business at or near that time; it never paid Ben Foy Motors' interest under the "10 plan".

### F. Mr. Foy and the Bank

#### 1. The Dispute

In the days that followed, Mr. Foy spoke with Randall Foster, the Bank's vice-president. Those discussions produced no agreement, but both learned that Mr. Foy had the vans, the Bank had the certificates of origin, and neither would part with either. Mr. Castleman had informed Mr. Foster that Ben Foy Motors had paid him for the vans.

On February 18 and February 24, 1987, the Bank filed valid and enforceable financing statements in the Protho–Notary's office in Bedford County, Pennsylvania and in the Secretary of Commonwealth's Office in Pennsylvania, respectively, in which the Bank described the ten vans in dispute in this case.[19] As of February 25, 1988, Conversion Marketing was still in default of its obligations to the Bank and was still indebted to the Bank in the principal amount of $244,586.22, plus accrued interest and attorney fees.

The ten vans in question are also "floor planned" with Mr. Foy's account with his bank. Mr. Foy cannot sell the vans without the certificates of origin.

#### 2. The Suit

This suit involves Mr. Foy's claim for punitive damages and compensatory damages resulting from the Bank's retention of the certificates of origin and the Bank's counterclaim for the vans. Mr. Foy claims damages of $27,500.00 for depreciation[20], lost retail profit of $7,700.00[21], $13,971.00 in interest paid to his bank[22], and $2,650.00 in clean-up expenses necessary to prepare the vans for sale after so long a period of standing on the lot, for a total of $51,821.00. The vans will continue to depreciate, as a group, at a rate of $2,300.00 per month. Mr. Foy will continue to pay interest of $1,350.00 per month on the ten vans. The vans would have the same value to the Bank as to Ben Foy Motors.

On September 28, 1987, the Bank offered to allow the vans to be sold at auction, with the proceeds to be placed in escrow pend-

---

**19.** The parties have stipulated to this fact, but the parties do not stipulate that the Bank has a superior claim to the ten vans in dispute by virtue of these filings.

**20.** Mr. Foy starts with the $160,500.00 Ben Foy Motors paid for the vans, less $500.00 for the van obtained in July, 1986. From this, he deducts an assigned present value of $133,000.00, based on trade-in values and auction values, plus $1,000.00 per unit since the vans are not used.

**21.** Mr. Foy computed that the average straight sale of a converted van brought a profit of $1,270.00 in February, 1987, and believes that the vans would each bring a profit of $500.00 today.

**22.** This figure was computed from April 1, 1987, because Ben Foy Motors averages sixty days from purchase to sale.

ing resolution of this case. Mr. Foy rejected the offer because he believed that the vans' auction price would be far below their retail value, and he still would have to pay interest on his floor plan while the proceeds were in escrow.

## II. CONCLUSIONS OF LAW

### A. Indiana's Commercial Code

The parties agree that the Bank had a perfected security interest in the disputed vans under IND.CODE 26–1–9–302. Because the Bank's security interest was created in Indiana, Indiana's version of the Uniform Commercial Code governs the effect of that security interest. IND.CODE 26–1–9–103(1). Although a security interest in goods generally continues after disposition by the debtor, IND.CODE 26–1–9–306, a buyer in the ordinary course of business takes free of a security interest created by his seller, IND.CODE 26–1–9–307.

A buyer in the ordinary course of business is "a person who[,] in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods[,] buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker." IND.CODE 26–1–1–201(9). The exception for buyers in the ordinary course of business includes the following requirements:

> (a) the seller must be in the business of selling goods of that kind; in other words, the sale must be from inventory;
>
> (b) the buyer must purchase in good faith and without knowledge that the sale was in violation of others' ownership rights or security interests;
>
> (c) the competing security interest must be one "created by his seller," the buyer takes subject to existing security interests created by others.

*See* J. White and R. Summers, *Uniform Commercial Code* § 25–13; 1 R. Anderson, *Uniform Commercial Code*

§ 1–201:30. "Good faith" is defined as "honesty in fact in the conduct or transaction concerned", IND.CODE 26–1–1–201(19), and "knowledge" (or notice that the sale was in violation of others' ownership rights or security interests) includes actual knowledge, receipt of notice sent, or a situation where "from all the facts and circumstances known to [the person] at the time in question he has reason to know that it exists". IND.CODE 26–1–1–201(25). A merchant buyer may be a buyer in the ordinary course of business if he meets all of the above requirements.[23]

### B. The Parties' Arguments

Ben Foy argues that he is a buyer in the ordinary course of business under IND. CODE 26–1–9–307 and that the Bank's possession of the certificates of origin for the vans in question does not defeat his claim under that provision. Specifically, he asserts that Indiana's vehicle title act, IND. CODE 9–1–2–3, does not affect the provisions in Article 9 of Indiana's version of the U.C.C. governing security interests, IND. CODE 26–1–9 *et seq.*

The Bank argues that Ben Foy cannot meet the requirements of a "buyer in the ordinary course of business". The Bank advances three arguments in support of this position. First, the Bank contends that the economic substance of the transactions between Ben Foy and Conversion Marketing did not amount to completed sales for value, and, therefore, Ben Foy was not a "buyer". Alternatively, the Bank argues that, even if the transactions constituted "purchases" so as to qualify Ben Foy as a "buyer", the sale was not in the ordinary course of business because it involved the "10 plan" interest program (a "buy-back" provision) and the practice of allowing Conversion Marketing to retain the certificates of origin until sale to a consumer. The Bank's third argument is that Ben Foy did not purchase the vans in "good faith" or with "honesty in fact" because:

---

**23.** Whether the requirement of observance of reasonable commercial standards, *see* IND. CODE 26–1–2–103, applies to a merchant buyer is discussed *infra* at 757–758.

(a) Ben Foy knew [24], through Mr. Castleman, that the Bank held the certificates of origin for some of the vans in question and that Mr. Castleman was not authorized under his security agreement with the Bank to sell those vans without first paying off the advances due or obtaining a trust receipt;

(b) under Pennsylvania law, Ben Foy was not licensed to sell new vehicles, 63 Pa.Cons.Stat.Ann. §§ 818.2 and 818.5 (Purdon 1988), and the vans in question were new vehicles;

(c) with full knowledge of the reasons for the need to return the vans to Conversion Marketing's lot, Ben Foy allowed Olin Castleman to bring up to six vans back to Elkhart, Indiana to satisfy a floor plan check conducted by the bank in October 1986; and

(d) Ben Foy did not observe reasonable commercial standards of fair dealing because his failure to immediately obtain the certificates of origin for the vans in question was in violation of Indiana law, IND.CODE 9–1–2–3(a), and standard practices in the van conversion industry.

## C. Analysis

### 1. *Economic Substance of the Transactions*

■ The proof at trial did not support the Bank's argument that the transactions between Ben Foy and Conversion Marketing did not constitute purchases of the vans in question. Although the "10 plan" contained certain advantages for Ben Foy, those advantages did not negate the fact that Ben Foy gave checks to Conversion Marketing in payment for the vans delivered. Moreover, Ben Foy and Olin Castleman intended that Ben Foy take possession of the vans as his own to sell or use; nothing more is required to be a buyer under IND.CODE 26–1–9–307. *See* IND. CODE 26–1–9–105(3) (specifying that Article 2 definition of "sale" applies to Article 9); IND.CODE 26–1–2–106(1) ("sale" defined as "the passing of title from the seller to the buyer for a price"); IND. CODE 26–1–2–401 ("Subject to these provisions and to the provisions of [Article 9] on secured transactions, title to the goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.").

### 2. *"Ordinary course of business"*

The Bank's argument that the "10 plan" constituted a sale outside the ordinary course of business is not supported by any authority. The Indiana legislature already has specified the definition of "ordinary course of business" in IND.CODE 26–1–1–201(9), which enumerates certain elements discussed above. Given this specific statutory definition, it is not the role of the court, especially a federal court interpreting state law in a case under diversity jurisdiction, to add a further requirement that the "ordinary course of business" be limited to transactions used by others in the trade.[25] Moreover, even if the court were free to read such a requirement into IND.CODE 26–1–1–201(9), the possibility of discouraging innovative commercial marketing and financing arrangements would counsel against such an interpretation.

■ The Bank also argues that the sale of the ten vans in question constituted a "bulk transaction" under IND.CODE 26–1–

---

**24.** The "good faith" and "without notice" provisions of IND.CODE 26–1–1–201(9) tend to merge under IND.CODE 26–1–9–307. *See* J. White and R. Summers, *Uniform Commercial Code* § 25–13 at 1069 ("Exactly what the good faith requirement adds is unclear."); 1 R. Anderson, *Uniform Commercial Code* § 1–201:38 at 200 ("It is extremely doubtful whether the requirement of good faith has any significance in the definition of the buyer in ordinary course.").

**25.** The bank argues that other aspects of the transactions, such as the return of vans to meet the October, 1986 floor plan check and Ben Foy's failure to request immediate delivery of the certificates of origin, brought the sales outside the ordinary course of business. As noted above, the "ordinary course of business" standard does not preclude merchants from implementing flexible or innovative marketing arrangements with their suppliers. To the extent that these arrangements affect the analysis of the good faith and notice requirements, they are discussed *infra* at 756–757.

1–201(9) [26] and, therefore, is by definition outside the ordinary course of business. The court disagrees. Ben Foy purchased the vans either individually or several at a time on various dates between July, 1986 and January, 1987. Such transactions do not even approach a "transfer in bulk".

### 3. "Good Faith" or "Honesty–in–Fact" and "Knowledge or Notice"

#### a. Nondelivery of the Certificates of Origin

The Bank's argument that Ben Foy knew that Conversion Marketing's sale of vans for which the Bank held the certificates of origin violated the security agreement is not supported by the proof at trial. As noted above,[27] Mr. Foy and Mr. Turner allowed Mr. Castleman to retain the certificates of origin until the time of sale to a consumer due to the "buy back" feature of the "5 plan" and "10 plan". That some van convertors with whom Mr. Foy and Mr. Turner dealt provided the certificates of origin fairly contemporaneously with delivery and payment [28] does not alone preclude Ben Foy's "honesty in fact" in light of the "buy back" feature and Mr. Castleman's testimony, corroborated by Mr. Foy, that Mr. Castleman informed Mr. Turner and Mr. Foy that he kept the certificates of origin for the vans sold to Ben Foy in his desk drawer.[29] Viewed in the context of the business relationship between Ben Foy and Conversion Marketing prior to the collapse of Conversion Marketing, this practice does not indicate that Ben Foy was not "honest in fact" with regard to the purchase of these vans.

#### b. Return of Vans for the Floor Plan Audits

Only Mr. Castleman's testimony, which the court finds incredible,[30] supports the Bank's contention that Ben Foy knew that Mr. Castleman was taking six vans back to Indiana to satisfy the bank's floor plan check. Absent any credible testimony to the contrary, the court must accept Mr. Foy's account of the circumstances of the transaction. Mr. Foy testified that he believed that Mr. Castleman was taking the vans to try to sell them to other dealers; that Mr. Castleman would leave signed checks for the vans he took is not inconsistent with that belief. *See supra* at 753.

#### c. Pennsylvania Licensing Requirements

The Bank's argument concerning Ben Foy's sale of converted vans under a used-car dealer's license in Pennsylvania presents a difficult issue of Pennsylvania law: whether a converted van constitutes a "new" vehicle within 63 Pa.Cons.Stat.Ann. §§ 818.2 and 818.5 (Purdon 1988). However, the court need not decide this issue because Ben Foy's compliance with Pennsylvania dealership licensing requirements is irrelevant to the issue of his honesty in fact in the purchase of the ten vans in question. Whether a buyer buys in the ordinary course of business is determined by the circumstances at the date of purchase; the buyer's subsequent conduct does not affect his status if in fact he acted in good faith at the time of the purchase. *C. Jon Development Corp. v. Pand–Rorsche Corp.*, 69 Ill.App.2d 469, 217 N.E. 2d 416 (1966); 1 R. Anderson, *Uniform Commercial Code* § 1–201:19. Ben Foy's sale of the vans in question, which has not yet occurred, and his compliance with Pennsylvania law in making that sale would be subsequent to the purchase of the vans.

Ben Foy's compliance with Pennsylvania licensing requirements during the sale of other converted vans, even those obtained from Conversion Marketing, is similarly irrelevant because it does not relate to the

---

**26.** This provision provides that "[b]uying [for purposes of determining status as a buyer in the ordinary course of business] does not include a transfer in bulk".

**27.** *See supra* at 750–751.

**28.** *See supra* at 750–751.

**29.** Moreover, under his own financing arrangement, Mr. Foy was not required to allow the bank to hold certificates of origin or title. *See supra* at 749.

**30.** *See supra* n. 1.

transactions in question. In short, Ben Foy's business practices in general do not affect the issue of good faith regarding these specific transactions. Accordingly, the issue of compliance with Pennsylvania's statutory dealer licensing requirements does not affect the issue of Ben Foy's good faith in purchasing the vans in question.

#### d. Commercial Reasonableness

The Bank argues that a standard of commercial reasonableness applies to merchants claiming protection under Indiana law as a buyer in the ordinary course of business. Indiana courts have not expressly applied the standard of commercial reasonableness to a merchant claiming protection under IND.CODE 26–1–9–307. Although the Indiana Court of Appeals discussed the issue in passing in *First Nat. Bank, Martinsville v. Crone*, 157 Ind.App. 665, 301 N.E.2d 378 (1973), that reference was merely dicta. The Indiana Court of Appeals declined to reverse the verdict in favor of the buyer because no evidence had been introduced at trial concerning reasonable commercial standards in the logging business. *Id.* 301 N.E.2d at 381.[31]

Dicta from an Indiana intermediate appellate decision does not conclusively establish whether the Indiana Supreme Court would adopt such a standard in a case similar to this case. *See Green v. J.C. Penney Auto Ins. Co., Inc.*, 806 F.2d 759 (7th Cir.1986). Accordingly, this court must attempt to predict how the Indiana Supreme Court would interpret IND.CODE 26–1–9–307 in this context. In making that determination, the court reasonably may assume that the Indiana Supreme Court would follow the rule that appears best to effectuate the policies underlying Indiana's version of the U.C.C. *See Bowen v. United States*, 570 F.2d 1311, 1322 (7th Cir. 1978).

For several reasons, the standard of commercial reasonableness between merchants does not apply to the definition of a buyer in the ordinary course of business. First, to the extent that an objective standard of commercial reasonableness would prevent a buyer who was honest in fact from claiming protection under IND.CODE 26–1–9–307, it would conflict with the subjective standard adopted in IND.CODE 26–1–1–201(19) (definition of good faith as honesty-in-fact in the transaction). Had the Indiana state legislature meant to apply an objective standard of commercial reasonableness to merchant buyers, it could have expressly included such a requirement. *See IND. CODE 26–1–2–103(b)* (stating that for purposes of Article 2, which governs sales, "good faith" in the case of a merchant means "honest in fact *and* observance of reasonable commercial standards"). In such a situation, a court must not apply by analogy a provision that conflicts with a clearly applicable standard.

Second, and more fundamentally, IND. CODE 26–1–2–103(b) by its terms only applies to Article 2 of the Indiana version of the U.C.C., IND.CODE 26–1–2–101 *et seq.*, which governs the sale of goods and the contractual issues that arise in sales of goods. *See IND.CODE 26–1–2–103* ("*In IC 26–1–2,* unless the context otherwise requires: ... 'good faith' in the case of a merchant means ..." (emphasis added)); B. Clark, *The Law of Secured Transactions Under The Uniform Commercial Code* § 3.4[1] at 3–20 (application of the subjective test "seems more in line with § 9–307, which makes no definitional cross-reference to the Article 2 definition of "good faith" and thus presumably incorporates the general definition found in § 1–201(19)"); 9 R. Anderson, *Uniform Commercial Code* § 9–307:29 at 208 ("even a merchant is not held to a standard higher than honesty in fact, as U.C.C. § 2–103(2) is not applicable to Article 9") and § 9–307:11 at 196.[32]

---

**31.** "Had there been evidence of [reasonable commercial standards] introduced[,] the Bank's argument in this regard may have been meritorious[;] however, under the facts of this case, neither we nor the trial court have an evidentia-ry basis for reaching the result urged by the Bank." *Id.* 301 N.E.2d at 381.

**32.** Courts in other jurisdictions have found this reasoning persuasive. *See Massey–Ferguson, Inc. v. Helland*, 105 Ill.App.3d 648, 61 Ill.Dec.

Finally, respect for Indiana's courts as the primary expositors of Indiana law counsels restraint by a federal court in expanding state law or announcing new state law principles. *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987); *see Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (federal court in diversity should be unwilling to speculate on any trends in state law).[33]

## D. Remedy

For the foregoing reasons, the court concludes that the law and the facts are with Mr. Foy. Mr. Foy was a buyer in the ordinary course of business; his rights are superior to those of the Bank, and he has suffered damages. The court concludes that the damages computations to which Mr. Foy testified are reasonable, and that he is entitled to recover damages in those amounts. Accordingly, the court awards damages to Mr. Foy in the sum of $63,771.00[34] and orders the Bank to deliver the certificates of origin to him.

The court further concludes, however, that Mr. Foy has not proven himself entitled to punitive damages. Under Indiana law, a plaintiff seeking punitive damages in a contract action must prove by clear and convincing evidence that malice, fraud, gross negligence or oppressive conduct accompanied the defendant's actions. *Travelers' Indemnity Co. v. Armstrong*, 442 N.E.2d 349 (Ind.1982). Further, the defendant is entitled to the benefit of a presumption that its "actions, although tortious, were nevertheless noniniquitous human failings, i.e. that [it] is *not guilty of*

the quasi-crime alleged." *Orkin Exterminating Co., Inc. v. Traina*, 486 N.E.2d 1019, 1023 (Ind.1986).

Mr. Foy's evidence does not approach this standard. The Bank had a reasonable basis for its position; it did not act with indifference toward Mr. Foy. *Compare Bank of New York v. Bright*, 494 N.E.2d 970 (Ind.App.1986). Indeed, the Bank attempted to arrange for the sale of the vans during the pendency of the litigation. Although Mr. Foy had a reasonable basis for refusing that offer, the Bank's actions demonstrate no malice, fraud, gross negligence or oppressive conduct. The parties had a good faith dispute concerning an uncertain area of the law. Under those circumstances, neither party should face punitive damages under Indiana law for standing its ground and choosing to litigate. *See Hamilton County Bank v. Hinkle Creek Friends Church*, 478 N.E.2d 689 (Ind.App.1985); *First Federal Savings & Loan Ass'n v. Mudgett*, 397 N.E.2d 1002 (Ind.App.1979).

## III. ORDER

For the foregoing reasons, the court finds for the plaintiff and against the defendant and directs that judgment be entered for the plaintiff and against the defendant in the sum of $63,771.00, possession of the certificates of origin in question, and the costs of this action.

SO ORDERED.

---

142, 434 N.E.2d 295 (1982); *Frank Davis Buick v. First Alabama Bank*, 423 So.2d 855, 858 (Ala. Civ.App.1982); *Sea Harvest, Inc. v. Rig and Crane Equipment Corp.*, 181 N.J.Super. 41, 436 A.2d 553, 558 (1981); *Martin–Marietta Corp. v. New Jersey National Bank*, 612 F.2d 745 (3d Cir.1979) (applying New Jersey law); *Sherrock v. Commercial Credit Corp.*, 290 A.2d 648 (Del. 1972); *but see Swift v. J.I. Case Co.*, 266 So.2d 379 (Fla.App.1972).

33. On the issue of commercial reasonableness, the Bank has argued that Ben Foy's failure to comply with IND.CODE 9–1–2–3, which requires automobile dealers to acquire a certificate of origin for all new vehicles obtained, indicates

that Ben Foy did not adhere to reasonable commercial standards of fair dealing. Because the court holds such a standard inapplicable to a merchant buyer under IND.CODE 26–1–9–307, the court need not address this argument.

34. Damages are computed as follows:

| | |
|---|---|
| Depreciation to trial | $27,500.00 |
| Depreciation since trial | 6,900.00 |
| Lost retail profit | 7,700.00 |
| Ben Foy's interest to trial | 13,971.00 |
| Ben Foy's interest since trial | 5,050.00 |
| Clean-up expenses | 2,650.00 |
| Total | $63,771.00 |